UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

TARIK OMAR JONES,

Defendant.

_______________________________________/

Case No. 1:19-cr-20693
Honorable Thomas L. Ludington
Magistrate Judge Patricia T. Morris

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court pursuant to Defendant's Motion to Suppress. ECF No. 16. Defendant was charged with one count of being a felon in possession of a firearm after police stopped him for driving a vehicle with an illegal window tint and discovered a firearm on his person. He seeks to suppress evidence of the firearm as obtained in violation of the Fourth Amendment. For the reasons set forth below, Defendant's Motion to Suppress will be denied.

**I.**

**A.**

On October 16, 2019, Defendant Tarik Omar Jones was indicted with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). ECF No. 1. On May 5, 2020, Defendant filed a motion to suppress the firearm as obtained in violation of the Fourth Amendment. ECF No. 16. The Government responded that the firearm was discovered pursuant to a lawful consent search. ECF No. 18 at PageID.101–02. Defendant, on the other hand, denies granting police consent to search his person. ECF No. 16 at PageID.83–86.

An evidentiary hearing was scheduled for October 22, 2020 but was delayed several times due to the novel coronavirus ("COVID-19") pandemic. The hearing was eventually held by Zoom

videoconference on April 15, 2021 with Defendant's consent. During the hearing, this Court heard testimony from Defendant and the arresting officer, Michigan State Police Trooper Patrick Miller. The hearing also included video evidence from the dashcam inside Trooper Miller's squad car. The evidence provided at the hearing is described in further detail below.

**B.**

On the evening of October 8, 2019, Michigan State Police Trooper Patrick Miller was patrolling Saginaw, Michigan in a two-person squad car when a Buick passenger vehicle with an illegal window tint passed in front of him. Trooper Miller quickly turned his squad car around and followed the Buick to a stop sign at the intersection of a nearby street. The Buick then attempted to cross the intersection without yielding to throughgoing traffic and nearly colliding with a passing pickup truck. Trooper Miller followed the Buick through the intersection and initiated a traffic stop by activating his patrol lights. The Buick initially stopped in front of a residential driveway, and Trooper Miller's partner exited the squad car and began approaching the Buick from the passenger side. As Trooper Miller's partner approached, the Buick moved several feet forward, prompting Trooper Miller's partner to yell, "Wait!" The Buick then came to a stop a few feet beyond the driveway. The driver rolled his windows down and stuck his hand outside the vehicle.

Trooper Miller then exited his squad car and approached the Buick on the driver's side. Upon reaching the vehicle, he immediately opened the driver-side door and made contact with Defendant Tarik Omar Jones, the driver and sole occupant of the vehicle. Trooper Miller testified that he immediately opened the driver-side door because "it was [his] opinion that the driver was attempting to conceal something in the vehicle or flee in the vehicle."

After opening the door, Trooper Miller asked Defendant for his driver's license, which Defendant promptly provided. After reviewing Defendant's driver's license, Trooper Miller asked

Defendant if he had any firearms on him or in the vehicle. Defendant responded, "No." Trooper Miller then asked Defendant whether he was "sure" of his answer. Defendant, again, stated that he had no weapons. Trooper Miller then asked Defendant to step out of the vehicle.

What happened next remains in dispute. The dashcam video shows Defendant exiting the vehicle before promptly being handcuffed and searched by Trooper Miller. There is no audio on the dashcam video because the device apparently malfunctioned just before Trooper Miller first approached the Buick. During the evidentiary hearing, Trooper Miller testified that he asked Defendant, "Do you mind if I search your person?" Defendant then allegedly agreed to the search.

Defendant, however, offers a different recollection. During the hearing, he confirmed that he was asked whether he had any guns on him—and that he lied when he said "No"—but denies ever being asked for consent to search his person. Defendant testified that when he stepped out of the vehicle, Trooper Miller immediately handcuffed him and began searching through his pockets without seeking any permission to do so. Defendant claimed that he asked Trooper Miller why he was being searched and that the Trooper responded simply, "Routine."

The parties agree that Trooper Miller searched Defendant for about two minutes before a pistol fell from Defendant's waistband and onto the ground. Defendant was then moved to the squad car and placed under arrest.

**C.**

Following the evidentiary hearing, this Court directed the parties to file supplemental briefing addressing (1) whether Trooper Miller initiated a search of Defendant or the Buick in violation of the Fourth Amendment by immediately opening the driver-side door upon approaching the vehicle; (2) whether Trooper Miller unreasonably prolonged the traffic stop after Defendant furnished a valid driver's license; and (3) whether Trooper Miller's failure to obtain

Defendant's consent to be placed in handcuffs affected the validity of Defendant's alleged consent to the search. The parties have since filed supplemental briefs as directed. *See* ECF Nos. 32, 33, 34. Accordingly, Defendant's Motion to Suppress is ripe for resolution.

**II.**

**A.**

The parties agree that the initial stop of the Buick was lawful. ECF No. 16 at PageID.84; ECF No. 18 at PageID.98. Accordingly, the first issue is whether by opening the driver-side door of the Buick, Trooper Miller "searched" the vehicle. As explained below, Trooper Miller did invade the constitutionally protected interior of the vehicle when he opened the driver-side door, thereby effectuating a warrantless search.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "Warrantless searches are presumptively unreasonable under the Fourth Amendment." *United States v. Ukomadu*, 236 F.3d 333, 337 (6th Cir. 2001). "While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police." *New York v. Class*, 475 U.S. 106, 114–15 (1986).

In *Class*, police stopped a vehicle for driving over the speed limit. *Id.* at 107–08. After making contact with the driver, one of the police officers opened the driver-side door of the vehicle to look for the vehicle identification number ("VIN"), which was usually located in the doorjamb. *Id.* at 108. The officer did not find the VIN in the doorjamb, so he reached into the vehicle to "move some papers obscuring the area of the dashboard where the VIN is located in later model

automobiles." *Id.* In doing so, the officer spotted the "handle of a gun protruding about one inch from underneath the driver's seat." *Id.* Police seized the gun and arrested the driver.

The Supreme Court held that the officer's "intrusion" into the vehicle "constituted a search" for purposes of the Fourth Amendment *Id.* at 115. The Court also held that the search was reasonable because "the governmental interest in highway safety served by obtaining the VIN [was] of the first order" and "the search was focused in its objective and no more intrusive than necessary to fulfill that objective." *Id.* at 118. On the latter point, the Court added, "The VIN, which was the clear initial objective of the officer, is by law present in one of two locations—either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile." *Id.*

In this case, Trooper Miller opened the driver-side door of the Buick before even receiving Defendant's driver's license. In doing so, Trooper Miller invaded the constitutionally protected interior of the vehicle and thereby effectuated a "search" for purposes of the Fourth Amendment. The fact that Trooper Miller simply stood on the inside of the opened door, instead of leaning into the vehicle, is immaterial. *See United States v. Bradley*, No. 5:19-CR-00007-TBR-1, 2019 WL 4307877, at *2 (W.D. Ky. Sept. 11, 2019) ("It is unclear if Deputy Edwards moved anything in the vehicle. He has no recollection of doing so. However, this is immaterial because simply opening the door of the vehicle constitutes a search.") (citing *Class*, *supra*); *accord United States v. Matthews*, 422 F. Supp. 3d 1235, 1251 (W.D. Ky. 2019).

The Government argues that Trooper Miller's conduct was justified because he had the right to order Defendant out of the vehicle and opening the door "was simply a step in the furtherance of that right," ECF No. 32 at PageID.140 (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977)). The Government also argues that the intrusion into a constitutionally protected area

is only a search if that intrusion is to "obtain information," and that Trooper Miller "did not open the car door to obtain information, but did so to protect officer safety." *Id.* (citing *United States v. Jones*, 565 U.S. 400, 407 (2012)).

The Government's argument is unpersuasive. First, Trooper Miller admitted that he opened the door of the Buick not because he intended to ask Defendant to step out, but because he thought the driver was "trying to conceal something" or to flee. Of course, whether a suspect is attempting to conceal an object or flee is relevant to officer safety, but, given the facts here, there is no reason to believe that opening the driver-side door was necessary for officer safety. The dashcam video shows that as Trooper Miller approached the vehicle, Defendant had his windows rolled down and at least one hand outside the window. *Cf. Matthews*, 422 F. Supp. 3d at 1251 (opening driver-side door was reasonable where police "could not see inside the vehicle because of the tint on the windows," driver had opened the door "a matter of inches," and vehicle was stopped in "arguably the most dangerous part of Kentucky"). Furthermore, Trooper Miller did not explain, nor is it obvious, how opening the driver-side door would have helped him prevent Defendant from escaping when the driver-side window was already down and the Buick was flanked on either side by police officers.

The Government's reliance on *Mimms*, *supra*, is also misplaced. In that case, the Supreme Court held that police may order the driver to step out of the vehicle during a lawful traffic stop. *Mimms*, 434 U.S. at 111. But *Mimms*, which was decided nearly a decade before *Class*, *supra*, did not address the constitutionality of an officer's intrusion into a vehicle. The Court in *Mimms* was narrowly concerned with weighing the driver's personal liberty interest against the government's interest in officer safety. *See id.* at 109–111. The Court held that the "additional intrusion" of being ordered out of the car was "*de minimis*." *Id.* at 111. Though certainly a landmark case, the Court's

decision in *Mimms* is not controlling here. Indeed, the Ninth Circuit recently rejected the notion that *Mimms* allows the police to invade the interior of a vehicle during a traffic stop.

In *United States v. Ngumezi*, 980 F.3d 1285 (9th Cir. 2020), police approached a vehicle that was parked at a gas station without license plates. *Id.* at 1286. The driver had recently purchased the vehicle, and a bill of sale was displayed in the corner of the windshield. *Id.* Because a gas pump blocked access to the driver-side of the vehicle, one of the officers opened the passenger-side door, leaned into the vehicle, and asked the driver for his license and registration. *Id.* The driver's license was suspended, so the vehicle was towed and inventoried. *Id.* at 1287. During the inventory search, police discovered an unlawfully possessed firearm. *Id.*

Relying on *Class*, *supra*, the Ninth Circuit held that the officer's intrusion into the vehicle was an unconstitutional search. *Id.* at 1288–90. In doing so, the Ninth Circuit rejected the government's argument that opening a passenger door and leaning into the vehicle is "less intrusive" than ordering the driver to step out of the vehicle, as the police are entitled to do under *Mimms*. *Id.* at 1289. The Ninth Circuit reasoned that "even if opening a door and leaning into the car is a lesser intrusion on the driver's liberty, it is a greater intrusion on the driver's privacy interest in the car's interior." *Id.*

The Government attempts to distinguish *Ngumezi* by arguing that Trooper Miller had a particularized justification for opening the door. ECF No. 34 at PageID.163. As explained above, however, Trooper Miller's stated purpose included an investigatory motive—verifying whether "something" had been concealed—and his officer safety rationale is unsupported by the evidence. Accordingly, this Court finds the Ninth Circuit's reasoning in *Ngumezi* to be persuasive.

Based on the foregoing, Trooper Miller searched Defendant's vehicle by opening the driver-side door without a warrant or other justification in violation of the Fourth Amendment. The significance of this unconstitutional search is addressed in Section II.D., *infra*.

**B.**

The next issue is whether Trooper Miller unconstitutionally prolonged the stop of the Buick after reviewing Defendant's driver's license. Although Trooper Miller could have concluded the traffic stop after reviewing the license, the stop was not unreasonably prolonged because his questioning was relatively brief and directly concerned officer safety.

"Stopping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (quoting *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009)). The constitutionality of that seizure must be decided by reference to the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). "To qualify as reasonable seizures under the Fourth Amendment, *Terry* detentions must be 'limited in [both] scope and duration.'" *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (quoting *Fla. v. Royer*, 460 U.S. 491, 500 (1983)). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Nonetheless, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

Accordingly, the question in this case is whether Trooper Miller's questioning measurably prolonged the stop. The answer follows naturally from the Sixth Circuit's decision in *Everett*,

*supra*. In *Everett*, police initiated a traffic stop of a vehicle that had been speeding. The police officer conducting the stop was a member of "an aggressive patrol unit designed to make traffic stops and *Terry* stops in high-crime areas." *Everett*, 601 F.3d at 486. The driver produced a suspended license but explained to the officer that he was in the process of getting his license back and provided alternate identification. *Id.* The officer allegedly smelled alcohol on the driver's breath and asked him to exit the vehicle. *Id.* at 487. The officer then, without any particularized basis for doing so, asked the driver whether he had "anything illegal on his person, any weapons or narcotics or anything like that." *Id.* The driver admitted that he had an open receptacle and firearm in the vehicle. *Id.* The officer then asked whether the driver had any weapons or other contraband on him. *Id.* He said he did not but nonetheless allowed the officer to search his person. *Id.* The officer found "two baggies of marijuana" in his jacket. *Id.*

The district court ruled that the officer's questioning on matters "unrelated to the stop rendered the stop unreasonable under the Fourth Amendment" and suppressed the firearm that had been discovered. *Id.* The Sixth Circuit reversed. After canvassing the relevant case law, the court declined to adopt "a categorical ban on suspicionless unrelated questioning that may minimally prolong a traffic stop." *Id.* at 492. Instead, the Sixth Circuit held that the Fourth Amendment required a "fact-bound, context-dependent inquiry in each case," where the principal question would be "whether the 'totality of the circumstances surrounding the stop' indicates that the duration of the stop as a whole—including any prolongation due to suspicionless unrelated questioning—was reasonable." *Id.* at 493–94. "Judged by this standard, th[e] case [was] not remotely close." *Id.* at 495. The Sixth Circuit held that the officer's extraneous questioning was reasonable given its minimal duration—lasting only "several seconds"—and the fact that it "raised

the subject of 'weapons,' which is reasonably related to the 'legitimate and weighty' consideration of officer safety." *Id.* at 495 (quoting *Mimms*, 434 U.S. at 110).

In this case, Trooper Miller asked Defendant twice whether he had any firearms on him or in the car before asking him to step out of the vehicle. Like in *Everett*, the extraneous questioning was quite brief, consuming, at most, 13 or so seconds.[1] *Cf. Stepp*, 680 F.3d at 663 (holding that six minutes of extraneous questioning unreasonably prolonged traffic stop). The questioning was also narrowly related to the presence of firearms—a subject that *Everett* and other cases have held to be within the field of legitimate police inquiry. *See, e.g.*, *Everett*, 601 F.3d at 495 ("[T]here has been widespread agreement . . . that officers conducting a traffic stop may inquire about dangerous weapons."); *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007) ("For several years the rule in this circuit has been police officers are free to question individuals regarding the presence of weapons."); *United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005) ("Once the police stopped Willis, they could, within reason, search the area and question Willis about weapons for their own safety.").

Trooper Miller's repetition of the same question does, however, make this a closer case than *Everett*. At least one court in this circuit has held that the repeated, suspicionless questioning of a driver regarding weapons violates the Fourth Amendment. *See United States v. Eberhardt*, 416 F. Supp. 3d 700, 704 (W.D. Ky. 2019) (holding that traffic stop was unconstitutionally prolonged where driver "was asked the same questions repeatedly (and repeatedly answered in the negative) over a period of several minutes until he confessed"). Nonetheless, given the "totality of the circumstances surrounding the stop," *Everett*, 601 F.3d at 494, Trooper Miller's simple verification of Defendant's original answer did not unreasonably prolong the stop.

[1] According to the dashcam video, approximately 13 seconds transpire between when Trooper Miller opens the driver-side door and when Defendant exits the vehicle.

**C.**

The next issue is whether Defendant consented to the search of his person and, if so, whether his consent was "freely and voluntarily given." *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). For reasons explained below, this Court finds that Defendant freely and voluntarily consented to the search of his person.

"The Fourth Amendment permits a search without a warrant if valid consent to search is given." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). "The government bears the burden of demonstrating by a preponderance of the evidence, through clear and positive testimony, that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009) (internal quotation marks and citation omitted). "Whether these requirements were met 'is a question of fact to be determined from the totality of all the circumstances.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). "Factors to consider include 'the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.'" *United States v. Justice*, 464 F. App'x 448, 452 (6th Cir. 2012) (quoting *United States v. Worley*, 193 F.3d 380, 386 (6th Cir.1999)).

The threshold question is whether Defendant consented to the search of his person. Because the dashcam video lacks audio, the question turns on the credibility and reliability of the witnesses. At the hearing, Trooper Miller testified that he asked Defendant whether he would "mind" if Trooper Miller searched the vehicle and his person.[2] Defendant then indicated that he had no

[2] Specifically, Trooper Miller recalled asking "Would you mind if I take a look inside the vehicle?" and "Do you mind if I search your person?"

objection to the search. Trooper Miller further testified that it was his habit to ask for consent to search a suspect before putting the suspect in handcuffs. Defendant, of course, denies that such an exchange took place, but his testimony is less credible given his admission that he lied to police when he denied having a firearm on his person.[3] Having carefully considered the testimony of Trooper Miller and Defendant, including their demeanor and other indicia of credibility, this Court finds it more likely than not that Trooper Miller asked for consent to search Defendant and that such consent was granted.

The next question is whether Defendant's consent was freely and voluntarily given. As an initial matter, there is no allegation that Defendant's consent was induced by promises of leniency, deception, or physical force. Similarly, there is no allegation that Defendant was unable to understand the situation or the nature of his consent. To the contrary, Defendant, who is currently 43 years' old, testified during the hearing that he previously earned his GED, completed some college coursework, and has had roughly a "dozen" interactions with police since the age of 17. Defendant also testified that he understood his Fourth Amendment right "not to be searched without a warrant."

Defendant's only challenge to the validity of his consent involves Trooper Miller's decision to handcuff him before conducting the search.[4] Specifically, Defendant argues that his consent was automatically "withdrawn when Trooper Miller placed him in handcuffs" because he never consented to being handcuffed. ECF No. 33 at PageID.157.

---

[3] Defendant's recollection is also less reliable given that he misremembered the time of the stop. During direct examination, Defendant testified that he remembered the stop occurring sometime around 4:00 or 5:00 P.M. The dashcam video shows that the stop took place around 7:15 P.M.

[4] Defendant initially argued that the handcuffing constituted an arrest without probable cause and that, as a result, the subsequent search of his person was a search incident to an unlawful arrest. ECF No. 16 at PageID.85. This argument must be rejected based on the simple fact that even if Defendant was "arrested" when handcuffed, he had already consented to the search of his person, obviating any need for the search incident to arrest doctrine.

Defendant has not identified any authority suggesting that the detention of a suspect during a consent search vitiates the previously given consent. The cases holding that the mere fact of custody does not invalidate consent are legion. *See, e.g.*, *United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."); *United States v. Lee*, 793 F.3d 680, 686 (6th Cir. 2015) ("As the district court correctly noted, just because a defendant is handcuffed when he or she gives consent does not make such consent invalid."); *United States v. Koubriti*, 199 F. Supp. 2d 656, 665 (E.D. Mich. 2002) ("The fact of custody alone is not enough to demonstrate that consent was coerced."). If handcuffing does not invalidate a subsequently given consent, then, *a fortiori*, handcuffing should not invalidate a *prior* given consent.

The scope of consent is, of course, significant. An individual who consents to a search may limit the scope of the search or revoke her consent altogether. *United States v. Tatman*, 397 F. App'x 152, 162 (6th Cir. 2010). But in this case, Defendant granted unrestricted consent to search his person, and there is no evidence that he revoked his consent at any point.[5]

Defendant's argument is not without persuasive force, though. In the great majority of cases involving consent searches and detention, the police have some articulable basis for handcuffing the suspect. *See, e.g.*, *Watson*, 423 U.S. at 424 (valid arrest based on probable cause); *Lee*, 793 F.3d at 683 (handcuffed during sweep of parolee residence); *Koubriti*, 199 F. Supp. 2d at 666 (handcuffed during sweep of apartment). In this case, Trooper Miller had no particularized

[5] In his supplemental brief, Defendant claims that he revoked his consent for the search when he asked Trooper Miller why he was being placed in handcuffs. ECF No. 33 at PageID.158. Even if this exchange occurred, Defendant's question was not an unequivocal revocation of consent. *See United States v. Parker*, 412 F.3d 1000, 1002 (8th Cir. 2005) ("A defendant must make an unequivocal act or statement to indicate that consent is being withdrawn. ").

basis for handcuffing Defendant. He simply did so as a routine matter of ensuring officer safety.[6] Nonetheless, the question here is whether Defendant freely consented to the search of his person. There is simply no reason to believe that the handcuffing of Defendant, even if it lacked a reasonable basis, vitiated the free and voluntary consent that he had already provided.

Based on the foregoing, the Government has demonstrated by a preponderance of the evidence that Defendant freely and voluntarily consented to the search of his person.

**D.**

The final issue is whether the firearm should be suppressed on account of Trooper Miller's unlawful opening of the driver-side door. Because Defendant has not demonstrated a causal nexus between the illegal search and his subsequent consent, the firearm will not be suppressed.

"The Fourth Amendment's exclusionary remedy encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and, relevant here, evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'" *United States v. Powell*, 847 F.3d 760, 768 (6th Cir. 2017) (internal quotation marks omitted). "The driving force behind the rule, for the last half century, has been deterrence—to discourage the police from violating the Fourth Amendment by prohibiting them from leveraging illegal encounters into criminal convictions." *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011). This deterrence rationale limits the exclusionary rule in two ways: First, "[e]vidence will not be excluded unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Id.* (internal quotation marks omitted). Second, "[the] criminal suspect invoking the exclusionary rule

---

[6] During the hearing, Trooper Miller first implied that he handcuffed Defendant because he had moved the Buick a few feet forward after the vehicles first came to a stop. Troper Miller then clarified that, as a general matter, "putting [suspects] in handcuffs after obtaining consent . . . just allows [] for a safer procedure with investigating the traffic stop." Later in the hearing, Trooper Miller testified that he would not have searched Defendant if he had declined consent because, in the Trooper's opinion, he lacked an independent basis to do so.

must show that "its deterrence benefits outweigh its substantial social costs." *Id.* at 554 (internal quotation marks omitted).

In the typical exclusionary case involving a consent search, the defendant consents to a search sometime after an illegal seizure, raising the question of "whether [the] consent to search was sufficiently attenuated from [the] illegal seizure such that the causal chain was broken." *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003). In deciding this question, "courts must consider factors such as the length of time between the illegal seizure and the consent, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his Miranda rights before he consented." *Id.*

But this is not the typical exclusionary case. Here, both parties agree that the initial stop was lawful, and as explained in Section II.B., *supra*, Trooper Miller was within his right to ask about the presence of dangerous weapons. The only unlawful act during the stop was the initial opening of the driver-side door, which does not appear to have had any causal relationship with the subsequent consent search. Nevertheless, Defendant, relying on *Ngumezi*, *supra*, contends that the proper remedy is suppression of the firearm.

In *Ngumezi*, the Ninth Circuit suppressed the firearm based on the defendant's argument that if the officer had not leaned into the vehicle, the defendant "'might have been less intimidated' and could have directed [the officer] to the bill of sale on the windshield, . . . ending the encounter before the officers learned of his suspended license." *Ngumezi*, 980 F.3d at 1290–91. While the court expressed its doubts concerning the "speculative links" in the defendant's causal chain, it nonetheless suppressed the firearm because the government "made no effort" to carry its burden and show attenuation. *Id.* at 1291.

In this circuit, as in the Ninth Circuit, the government bears the burden of showing that challenged evidence is not fruit of the poisonous tree. *See United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003). In this case, like in *Ngumezi*, the Government did not address the issue of attenuation. There is, however, one crucial distinction between this case and *Ngumezi*: in *Ngumezi*, the defendant offered a causal relationship between the illegal search and his consent, whereas here, Defendant has not even alleged that the opening of the driver-side door affected his decision to consent to the search. While "[t]he Government must prove that particular evidence or testimony is not fruit of the poisonous tree, [] a defendant has the initial burden of establishing a factual nexus between the illegality and the challenged evidence." *United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980); *accord Gardner v. United States*, 680 F.3d 1006, 1011 (7th Cir. 2012); *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007); *United States v. Kornegay*, 410 F.3d 89, 94 (1st Cir. 2005); *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001). Because Defendant has not established such a nexus, he has not carried his initial burden, and the firearm will not be suppressed.

**III.**

Accordingly, it is **ORDERED** that Defendant's Motion to Suppress, ECF No. 16, is **DENIED**.

Dated: May 27, 2021

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge